UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MARGARITA RIVERA,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

Defendant.

Case No.:  15cv1055-W (BLM)

**REPORT AND RECOMMENDATION FOR ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 15, 16]**

Plaintiff Margarita Rivera brought this action for judicial review of the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits.  ECF No. 1. Before the Court are Plaintiff's Motion for Summary Judgment [ECF No. 15-1 ("Pl.'s Mot.")], Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment [ECF Nos. 16-1 and 17-1[1] ("Def.'s Mot.")], and Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition [ECF No. 18 ("Pl.'s Reply")].

This Report and Recommendation is submitted to United States District Judge Thomas J.

---

[1]  Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment appear on the Docket as two documents, numbers 16 and 17.  The contents of the documents are the same so, for clarity, the Court will refer to Defendant's cross-motion and opposition as one document, namely, "Def.'s Mot." and will cite to ECF No. 16-1.

1

Whelan pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California. For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

## PROCEDURAL BACKGROUND

On July 21, 2011, Plaintiff filed a Title II application for disability and disability insurance benefits, alleging disability beginning on June 30, 2011. <u>See</u> Administrative Record ("AR") at 148–50. The claim was denied initially on August 5, 2011, and upon reconsideration on January 26, 2012, resulting in Plaintiff's request for an administrative hearing. <u>Id.</u> at 63–70, 72–75, 86–87.

On January 8, 2014, a hearing was held before Administrative Law Judge ("ALJ") Leland H. Spenser. <u>Id.</u> at 13, 25–53. Plaintiff, an impartial medical expert, Kenneth L. Cloninger, M.D., and an impartial vocational expert ("VE"), Gloria J. Lasoff, testified at the hearing. <u>See</u> <u>id.</u> In a written decision dated January 29, 2014, ALJ Spenser determined that Plaintiff has not been under a disability, as defined in the Social Security Act, from June 30, 2011, through the date of the ALJ's decision. <u>Id.</u> at 13, 19. Plaintiff requested review by the Appeals Council. <u>Id.</u> at 8–9. In an order dated March 19, 2015, the Appeals Council denied review of the ALJ's ruling, and the ALJ's decision therefore became the final decision of the Commissioner. <u>Id.</u> at 1–7.

On May 11, 2015, Plaintiff filed the instant action seeking judicial review by the federal district court. <u>See</u> ECF No. 1. On April 14, 2016, Plaintiff filed an application for entry of default against Defendant. ECF No. 5. Default was not entered due to improper service. <u>See</u> ECF No. 6 at 1. On April 15, 2016, the District Judge issued an "Order to Show Cause why Case Should not be Dismissed for Failure to Prosecute" ("OSC"), in which he noted that Plaintiff "appeare[d]

to have only served the agency, not the United States." Id. at 1–2. On April 26, 2016, Plaintiff properly served Defendant, and Defendant entered an appearance in the case. ECF Nos. 7 and 8. On May 2, 2016, Plaintiff moved to vacate the OSC, and on May 9, 2016, the District Judge granted the motion and vacated the OSC. ECF Nos. 9 and 10.

On July 21, 2016, Plaintiff filed a motion for summary judgment alleging the following errors: the ALJ erred in finding Plaintiff less than fully credible, the "ALJ's interpretation of the medical evidence should not be entitled to deference as unsupported by law when taken in the context of the special weight to be afforded to [Plaintiff's] treating physicians," and the ALJ "improperly characterized Plaintiff's past relevant work and Plaintiff's ability to perform any past relevant work." Pl.'s Mot. at 4–9; Pl.'s Reply at 2–4. On August 29, 2016, Defendant filed a timely cross-motion for summary judgment asserting that the ALJ properly determined that Plaintiff was less than fully credible, that the ALJ's interpretation of the medical evidence was rational and entitled to deference, and that Plaintiff failed in her burden at step four of the sequential evaluation. Def.'s Mot. at 4–10. On September 20, 2016, Plaintiff timely filed a reply to Defendant's opposition and an opposition to Defendant's cross-motion for summary judgment. Pl.'s Reply; see also ECF No. 20 (accepting Plaintiff's filing as timely). Defendant did not file a reply. See Docket.

## **DISABILITY HEARING**

On January 8, 2014, Plaintiff, represented by counsel, appeared at the hearing before the ALJ. See AR at 25–53. Plaintiff was fifty-nine years old at the time of the ALJ's hearing. See id. at 28. During the hearing, the ALJ questioned Plaintiff regarding her work experience and alleged disability. Id. at 28–42. Plaintiff testified that she has a high school education, that prior to her alleged onset of disability, she had worked as an "assistant, . . . a parent volunteer

3

coordinator" for the "San Diego city schools," and that her duties included providing "translation [and conducting] conferences with parents."  Id. at 28–30, 38.  Plaintiff stated that she spent approximately three hours per day outside, 40 minutes to one hour during "morning duty," two hours during "lunch duty," and about 30 minutes at dismissal.  Id. at 38–39.  Plaintiff testified that she worked full-time until June 30, 2011, that her "headaches were getting worse" and that her primary doctor, Dr. Sierra, recommended that Plaintiff work four hours per day.[2]  Id. at 29–30.  Plaintiff also stated that she was absent during the last week of the school year due to her headaches.  Id. at 29.

Plaintiff testified that she lives with her two adult daughters and their two dogs, but does not care for the dogs, does not take the dogs for walks, and does not clean up after them.  Id. at 31, 34–35.  Plaintiff further stated that she cleans her house, does chores, drives a car three times a week to go grocery shopping, gardens for an hour to an hour-and-a-half every morning before the sun comes up, walks three times a week for about 20 minutes, sometimes reads, and volunteers in her granddaughter's kindergarten classroom once a week for about 40 minutes.  Id. at 32–35.

Plaintiff testified that she had her last seizure in 2006, and that headaches and her eye were her "main difficult[ies]."  Id. at 31, 38.  Plaintiff explained that she lost her right eye in a gunshot wound, but can see and read with her left eye, although her eye hurts when she reads small letters.  Id. at 31, 35, 40.  With respect to her headaches, Plaintiff testified that they are

---

[2]  Plaintiff stated that her last appointment with Dr. Sierra was in September 2011, that she was not working at the time, and opined that that is why Dr. Sierra did not impose any limitation on the amount of hours Plaintiff could work per day.  Id. at 47.

triggered by reading small letters for more than 20–25 minutes, exposure to sun, and stress. Id. at 35–36. Plaintiff stated that she gets "stressed" when she has to "strain [herself]" or is trying to catch up with work. Id. at 35–36, 38.

Plaintiff further testified that she takes more medication than she took in 2010, because her headaches are more frequent. Id. at 37. Plaintiff stated that she had headaches every day for the past month, whereas in the past, she only had headaches three to four times per week, and that taking a break in a dark place where she could sit down and relax for about 20–30 minutes helps reduce the headaches. Id. at 39–40. Plaintiff also stated that she takes Ibuprofen when she has headaches and that "[s]ometimes" it helps. Id. at 40. Plaintiff stated that she takes the medication in the morning about four to five times a week. Id. at 36–37. She alleged that because her headaches are getting worse, she has to take two Ibuprofen 800 milligram pills to stop the headache. Id. at 40. Plaintiff also claimed that her headaches last two to three hours if she does not take her medication right away, and an hour to two hours if she immediately takes the medication. Id. at 41.

Dr. Cloninger, a board-certified neurosurgeon, testified at Plaintiff's administrative hearing. Id. at 26, 41–48. He stated that Plaintiff's medical records indicate that in 2003, Plaintiff sustained a gunshot wound to the right orbit and right frontal lobe of her brain, lost sight in her right eye, and had a prosthesis inserted. Id. at 42, 44. Dr. Cloninger further testified that Plaintiff had a right frontal craniotomy and that her brain scan showed ensephalomalacia, a "softening of the brain right under that right frontal lobe," which he opined was Plaintiff's most significant problem. Id. He stated that Plaintiff had generalized seizures in 2005, and that Plaintiff's medical records and testimony establish that her last seizure was in 2006. Id. Dr. Cloninger also stated that Plaintiff's medical records consistently show that her Dilantin levels

were within the therapeutic range, indicating that she was "very complaint with her medication," and concluded that "seizures are not a problem." Id. at 43.

Dr. Cloninger also stated that Plaintiff had a motor vehicle accident on April 1, 2011, and that her headaches increased after the accident. Id. at 42–43. With respect to Plaintiff's headaches, Dr. Cloninger stated that he could not determine their frequency, and that most of them were "tension headaches" caused by stress or exposure to bright sunlight. Id. Dr. Cloninger noted that Plaintiff took Ibuprofen for headaches, and opined that there were better medications for treating headaches. Id. He also testified that many neurologists specialize in treating headaches and could be "of great help" to Plaintiff, and further noted that Plaintiff had not consulted such specialists. Id. He further stated that Plaintiff's testimony regarding the frequency of her headaches was inconsistent with her medical records. Id. at 43–44. Dr. Cloninger concluded that Plaintiff's impairments include headaches and blindness in her right eye, and that her seizures appear to be controlled. Id. at 44.

Dr. Cloninger testified that he was "not certain" whether Plaintiff's headaches limit her functional capacity. Id. He noted that if Plaintiff suffers from tension headaches, such headaches could be controlled by avoiding stress and sun exposure. Id. He further testified that if, on the other hand, Plaintiff suffers from migraine headaches, "sick headaches with photophobia, phonophobia, nausea, [and] occasional vomiting," such headaches "can be disabling." Id. Dr. Cloninger referenced treatment notes from Dr. Armstrong, a neurologist who had treated Plaintiff since 2005, indicating that Plaintiff suffered from recurrent headaches and that he prescribed Imitrex to relieve Plaintiff's migraine, noted that Dr. Armstrong's reference to Plaintiff's migraine "might have been the only reference to migraine" in Plaintiff's medical records, and that other references indicate that Plaintiff was suffering from tension headaches.

6

Id. at 46–47.  Dr. Cloninger stated that Plaintiff should avoid exposure to sunshine and stress.

Id. at 48.

Additionally, Ms. Lassof, a VE, testified at Plaintiff's administrative hearing.  Id. at 48–53.

She classified Plaintiff's past relevant work as a "[v]olunteer coordinator," Dictionary of

Occupational Titles ("DOT") 187.167-022, between sedentary or light, with an SVP 7.  Id. at 48–

49.  She opined that a hypothetical person of Plaintiff's age, education, and work experience,

blind in the right eye, with a seizure disorder, who is required to avoid hazardous environments

and prolonged periods in the sunshine or outdoors could perform Plaintiff's past work as a

"volunteer coordinator" as "normally performed."  Id. at 49.  The VE further testified that if such

a person was required to spend prolonged periods of time outdoors, the person would not be

able to perform Plaintiff's past relevant work "as actually performed," but such a person could

perform other work, including a "cleaner/sweeper," a "dining room attendant," a "hospital

cleaner," and a "cleaner/housekeeper."  Id. at 50–52.

The VE clarified that a person who works as a playground attendant is classified as a

"playground attendant," and that a person who is watching a playground is classified as a "child

care attendant."  Id. at 51.  She also stated that a child care attendant job does not "differentiate

whether [the person is] outside or indoors."  Id.

## ALJ's DECISION

On January 29, 2014, the ALJ issued a written decision in which he determined that

Plaintiff was not disabled as defined in the Social Security Act.  Id. at 13–20.  Initially, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since her alleged

disability onset date of June 30, 2011.  Id. at 15.  He then considered all of Plaintiff's medical

impairments and determined that the following impairments were "severe" as defined in the

Regulations: "seizure disorder, controlled; tension headaches; and right eye blindness." Id. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ concluded that Plaintiff's residual functional capacity ("RFC") permitted her to "perform a full range of work at all exertional levels but with the following nonexertional limitations: . . . the claimant retains the capacity to perform work activity that does not require peripheral vision or depth perception; must avoid a hazardous work environment and prolonged periods outdoors." Id. The ALJ then found that Plaintiff could perform her past relevant work as a "volunteer coordinator." Id. at 18. The ALJ also determined that Plaintiff has the ability to perform other work existing in significant numbers in the national economy, including a "dining room attendant" and a "hospital cleaner." Id. at 19.

## **STANDARD OF REVIEW**

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g). The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error. Id.; see also Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted). It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003). "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a

whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted). Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision. See Batson, 359 F.3d at 1193. This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. See Lewis, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. See Batson, 359 F.3d at 1193. Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Social Security Administration for further proceedings. Id.

## DISCUSSION

### I. Treating Physicians' Opinions

Plaintiff contends that her treating physicians diagnosed her with a seizure condition, headaches, and right eye blindness following a gunshot wound in 2003. See Pl.'s Mot. at 2; Pl.'s Reply at 3. Plaintiff argues that the ALJ overlooked the opinions of her treating physicians, who concurred that she suffers from the asserted conditions, opined that she would require a life-long anticonvulsant treatment for post-traumatic epilepsy, and placed her on a restricted work schedule. See Pl.'s Mot. at 5–6; Pl.'s Reply at 3–4. Defendant contends that the ALJ properly evaluated, summarized, and interpreted the medical evidence, and found that Plaintiff was not disabled during the relevant period, and asserts that Plaintiff is "essentially arguing for a more favorable interpretation of the medical evidence." Def.'s Mot. at 8.

9

### 1. Plaintiff's Medical Records

The Court initially notes that although Plaintiff argues that the ALJ disregarded the opinions of "three" of her treating physicians, Plaintiff does identify those physicians. See Pl.'s Mot. at 5 (citing AR at 239–49); Pl.'s Reply at 3 (citing AR at 250–61, 282, 321, 326). Plaintiff's citations to the record contain medical records from Drs. Spackman, Armstrong, Sierra and Ellis. See id. As discussed below, Drs. Armstrong, Sierra and Ellis examined and treated Plaintiff on numerous occasions, and Dr. Spackman examined Plaintiff only once during her Emergency Room visit on April 2, 2006.

Dr. Spackman

Plaintiff's medical records contain an "Emergency Service Report" from Dr. Sparkman dated April 2, 2006, noting that Plaintiff's chief complaint was "multiple seizures with airway difficulty." AR at 321–24, 612–15. Dr. Spackman noted that Plaintiff had a history of a gunshot wound to the head, was status post right eye enucleation, right orbital reconstruction, and cerebral spinal fluid leakage, and presented with her first seizure. Id. at 321, 612; see also id. at 324, 615. Plaintiff reported a headache lasting three weeks, which worsened in the past two days, was seen by her primary care physician, and started taking Motrin for headaches. Id. at 321, 612. Plaintiff also reported fever and chills associated with nausea. Id. Dr. Spackman noted that Plaintiff "had 3 witnessed seizures, each lasting less than 30 seconds." Id. He also stated that Plaintiffs' X-ray showed "hypoaeration, no acute cardiopulmonary disease," the non-contrast head CT showed "postoperative surgical changes in the right frontal lobe and skull, no acute disease," and the "C-spine X-ray series w[ere] negative." Id. at 323, 614; see also id. at 326 (listing the following impressions of Plaintiff's head CT results: (1) "[p]rior right frontal

craniotomy with encephalomalacia[3] of an area of the right frontal lobe most likely related to prior surgery" and (2) "no acute findings."). Dr. Spackman's diagnoses included seizure and fever. Id. at 324, 615.

Dr. Armstrong

Dr. Armstrong has been Plaintiff's treating neurologist since 2005. Id. at 281. On April 24, 2006, Dr. Armstrong noted that Plaintiff "had headaches for a number of weeks that [Plaintiff] f[elt] [we]re aggravated by the children at her work," a seizure three weeks ago, and that Plaintiff's headaches had improved since the seizure, were "no longer as severe," and were not accompanied by phonophobia, photophobia, nausea or vomiting. Id. at 413–14. Dr. Armstrong noted that Plaintiff's CT scan of the right frontal region "showed no change, only postoperative and post-traumatic abnormalities." Id. Dr. Armstrong's assessment was (1) post-traumatic seizure disorder, no recurrent seizures on Dilantin, and (2) "[h]eadaches which sound like muscle contraction headaches." Id. He noted that Plaintiff's headaches responded "when severe" to Tylenol or Ibuprofen, and stated that he might refer Plaintiff to the headache management program if her "headaches are resistant." Id.

Dr. Armstrong's October 2007 progress notes indicate that Plaintiff's headaches were "much less frequent," that Plaintiff "rarely t[ook] meds for them," but that her headaches increased with stress. Id. at 406–07. He noted that Plaintiff was alert and oriented, and had

---

[3] "Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury." Pendley v. Colvin, 2016 WL 1618156, at *6 (D. Or. Mar. 2, 2016) (citation omitted).

normal gait and finger-nose-finger test.  Id. at 407.  Dr. Armstrong's November 2008 progress notes state that "Plaintiff's [h]eadaches [we]re better," her physical exam was within the norm, and she was seizure-free on current treatment regimen.  Id. at 385.  Dr. Armstrong's diagnosis was generalized epilepsy.  His April 2009 progress notes state that Plaintiff was taking Phenytoin to manage seizures, her Phenytoin level was 17.5, she tolerated Phenytoin well, and did not have interval seizures.  Id. at 377.  Dr. Armstrong noted that Plaintiff had "infrequent" headaches and diagnosed generalized epilepsy.  Id.

Dr. Armstrong's January 2010 progress notes state that Plaintiff developed a seizure disorder 2005, was "on [P]henytoin," tolerated Phenytoin well, her Phenytoin level was 16.4, and she did not have interval seizures.  Id. at 352.  Dr. Armstrong stated that Plaintiff had "moderate bitemp headache for approximately 5 days," which was initially aggravated by coughing, with no photophobia, chronophobia, nausea or vomiting, and that Plaintiff "ha[d] not had headaches in quite a while."  Id.  He diagnosed generalized epilepsy and opined that Plaintiff was "doing well" and should "[c]ontinue present management."  Id. at 353.

Dr. Armstrong's October 2010 progress notes state that Plaintiff had frequent headaches, but that "headache[s] severe enough . . . to take pain meds [were] infrequent."  Id. at 346.  He noted "no interval seizures" and that Plaintiff was tolerating Phenytoin well.  Id.  He stated that Plaintiff was alert and oriented, had normal speech, balance and gait, and that her finger-to-nose and heel-to-shin test were also normal.  Id. at 347.  Dr. Armstrong diagnosis was controlled epilepsy.  Id.

Dr. Armstrong's July 2011 progress notes state that Plaintiff tolerated Phenytoin well and did not have interval seizures.  Id. at 253, 501.  He stated that Plaintiff had been involved in a motor vehicle accident on April 1, 2011, that her headaches increased after the accident, and

12

that Plaintiff's headaches also increased with "work stress," but "improved quite a bit" when she was on vacation.  Id.  Dr. Armstrong further noted that Plaintiff's Phenytoin level was 12.4, and diagnosed (1) generalized epilepsy, "seizure controlled on current treatment regimen," and (2) tension headache, "headaches improved with stress reduction."  Id. at 254, 502.  On September 16, 2011, Dr. Armstrong wrote a letter stating, *inter alia*, that Plaintiff developed seizure disorder in 2005, was on Phenytoin, and would "require life-long anticonvulsant treatment for post-traumatic epilepsy."  Id. at 281.  He also stated that Plaintiff suffered from "recurrent headaches" and should be followed by a neurologist.  Id.

Dr. Sierra

Dr. Sierra's notes indicate that in January 2008, Plaintiff presented with a headache that lasted one week, reported "daily" headaches, and was taking Vicodin and Tylenol, "which help[ed]."  Id. at 405–06.  Dr. Sierra stated that Plaintiff had no numbness, tingling, or dizziness, and that her last seizure was in 2006.  Id. at 406.  Dr. Sierra diagnosed headache and prescribed Hydrocodone-Acetaminophen.  Id.

Dr. Sierra's April 2008 notes state that Plaintiff was "negative" for headaches, blurred vision, nausea or vomiting, and that her physical exam showed no distress.  Id. at 396–97.  She assessed hypertension, uncontrolled DM2,[4] hyperlipidemia, and generalized epilepsy.  Id. at 397–98.  Dr. Sierra's June 3, 2008 progress notes state that Plaintiff presented with a headache that lasted two days, and that Plaintiff had been stressed at work.  Id. at 502–03.  Dr. Sierra assessed tension headache, "likely due to prior accident."  Id. at 503.  Dr. Sierra's June and

---

[4] "DM 2" stands for "Diabetes mellitus type 2."  Brouckaert v. Colvin, 2014 WL 3818299, at *6 (S.D. Cal. Aug. 4, 2014).

September 2008 exam notes state that Plaintiff was "negative" for headaches, blurred vision, vomiting and nausea, and showed "no distress." Id. at 391–93. Dr. Sierra assessed hypertension, controlled DM2, and generalized epilepsy. Id. at 392, 94.

In October 2008, Plaintiff saw Dr. Sierra for a follow-up appointment after her Emergency Room visit for "panic attacks." Id. at 386. Dr. Sierra stated that Plaintiff had dizziness and weakness, but was oriented, not in distress, and had a normal range of motion. Id. at 386–87. She assessed anxiety disorder, controlled DM2, and generalized epilepsy. Id. at 387.

Dr. Sierra's January 2009 notes state that Plaintiff had a "frontal area" headache that lasted two weeks, and that Plaintiff was stressed at work. Id. at 382. She further noted no weakness, numbness or tingling, and no distress. Id. at 382-83. Dr. Sierra's assessments included generalized epilepsy and tension headache, and she prescribed Ibuprofen. Id. at 383. Dr. Sierra's July 2, 2009 progress notes state that Plaintiff presented with a frontal headache that lasted 2–3 weeks, reported being stressed, and took Vicodin for the headaches. Id. at 360–61. She further noted no vision changes, numbness, or ringing, and stated that Plaintiff's physical exam was normal. Id. at 361. Dr. Sierra assessed tension headache, controlled DM2, and general epilepsy, and prescribed Hydrocodone-Acetaminophen for headaches. Id. Dr. Sierra's July 10, 2009 progress notes state that Plaintiff had a frontal headache for the past month, was "under a lot of stress at work," and was fatigued and "depressed at times." Id. at 359–60. Plaintiff's physical exam showed no distress, she was alert and oriented, had normal motor skills and reflexes, and intact cranial nerves. Id. at 360. Dr. Sierra assessed acute stress reaction and tension headache, prescribed Tylenol for Plaintiff's headache, and recommended "supportive care." Id. In August 2009, Dr. Sierra noted that Plaintiff had chronic back pain, reported that "Motrin helps," that she worked long hours, and that her pain was "worse at work."

14

1  <u>Id.</u> at 355–56.  Dr. Sierra assessed controlled DM2, low back pain, and "elevated blood pressure

2  reading w/o diagnosis of HTN."  <u>Id.</u>

3       Dr. Sierra's January 9, 2010 progress notes state that Plaintiff was "negative" for

4  headaches, blurred vision, nausea or vomiting, and Plaintiff was not in distress.  <u>Id.</u> at 353–54.

5  On January 16, 2011, Dr. Sierra noted that Plaintiff presented with a headache that lasted two

6  days and "need[ed] refill of Vicodin."  <u>Id.</u> at 518.  Dr. Sierra assessed tension headache and

7  acute bronchitis.  <u>Id.</u> at 519.

8       In May 2011, Dr. Sierra noted that Plaintiff was involved in a motor vehicle accident on

9  April 1, 2011, during which she was rear-ended, and developed neck pain and a headache after

10  the accident.  <u>Id.</u> at 504.  Plaintiff reported that her neck pain improved, but her headache did

11  not, and that she had been using Imitrex and Valium with "some relief."  <u>Id.</u>  Dr. Sierra

12  assessments included migraine headache and strained neck.  <u>Id.</u> at 505.  She also stated that

13  she would "consider referral if [Plaintiff showed] no improvement."  <u>Id.</u>

14       In her Work Status Report dated June 3, 2011, Dr. Sierra listed the diagnosis of tension

15  headache, placed Plaintiff "on modified activity at work and at home" from June 6 until June 10,

16  2011, and specified that Plaintiff was to work "[h]alf day only" during the period.  <u>Id.</u> at 246.

17  Dr. Sierra's June 20, 2011 Work Status Report noted the diagnosis of migraine headache, placed

18  Plaintiff on modified activity from June 21 through June 30, 2011, and "restricted [Plaintiff] to

19  working half days (4 hours daily)."  <u>Id.</u> at 245.

20       Dr. Sierra's September 2011 progress notes state that Plaintiff reported a headache and

21  that her physical exam showed "[n]o distress."  <u>Id.</u> at 264, 268.  Dr. Sierra assessed generalized

22  epilepsy, tension headache, hypertension, and hyperlipidemia.  <u>Id.</u> at 265–66; <u>see also</u> <u>id.</u> at

23  276.  She also noted that Plaintiff's Phenytoin level was 17.4.  <u>Id.</u> at 276.  On September 14,

2011, Dr. Sierra wrote a letter stating that Plaintiff had the following medical problems: anemia, generalized epilepsy, controlled DM2, and unilateral blindness, that Plaintiff was prescribed Imitrex to be taken at "onset of migraine headache," and listed other prescribed medications. Id. at 282.

Dr. Ellis

Dr. Ellis' May 2011 progress notes indicate that Plaintiff presented with a headache and reported "mild to moderate headache since [her motor vehicle] accident on 4/1/11," and that she "ha[d] had similar headaches in the past [, and] that [F]lexeril helped." Id. at 506. Dr. Ellis noted that Plaintiff was "negative" for blurred vision, double vision and photophobia, dizziness, sensory change, focal weakness and loss of consciousness, but had neck pain and headaches. Id. He observed that Plaintiff was oriented, well-developed, well-nourished, had normal gait, did not show cranial nerve deficit, and was not in distress. Id. at 507–08. Dr. Ellis' assessments included "injury neck, whiplash" and tension headache, and he prescribed Cyclobenzaprine for Plaintiff's headache. Id. at 507.

On April 1, 2011, Dr. Ellis wrote a "Work Status Report," in which he diagnosed Plaintiff with "injury neck, whiplash" and tension headache. Id. at 247. Dr. Ellis placed Plaintiff "on modified activity at work and at home" from May 10 through May 13, 2011, and specified that Plaintiff was restricted to working 4 hours per day. Id.

## 2. Relevant Law

The opinion of a treating doctor generally should be given more weight than opinions of doctors who do not treat the claimant. See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1222 (9th Cir. 2010) (citing Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)). If the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear

15cv1055-W (BLM)

and convincing" reasons supported by substantial evidence in the record.  Id.  Even when the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may properly reject the treating doctor's opinion only by providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so.  Id.  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)).  "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician; such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record."  Townsend v. Colvin, 2013 WL 4501476, at *6 (C.D. Cal. Aug. 22, 2013) (internal quotations omitted) (citing Lester, 81 F.3d at 830-31; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)).

> If a treating doctor's opinion is not afforded controlling weight,
>
> the ALJ must consider the "length of the treatment relationship and the frequency of examination" as well as the "nature and extent of the treatment relationship" . . . .  In addition, the ALJ must still consider the other relevant factors such as "the amount of relevant evidence that supports the opinion and the quality of the explanation provided" and "the consistency of the medical opinion with the record as a whole."

West v. Colvin, 2015 WL 4935491, at *8 (D. Or. Aug. 18, 2015) (quoting Orn, 495 F.3d at 631; 20 C.F.R. §§ 416.927(c); 404.1527(c)).

15cv1055-W (BLM)

### 3. Analysis

As noted above, although Plaintiff alleges that the ALJ disregarded the opinions of "three" of her treating physicians, Plaintiff does not identify those physicians, but cites to the medical records from Drs. Spackman, Armstrong, Sierra and Ellis.  See Pl.'s Mot. at 5–6 (citing AR at 239–49); Pl.'s Reply at 3 (citing AR at 250–61, 282, 321, 326).  Plaintiff also does not clearly identify or describe the specific opinion(s) of each of those doctors that she believes the ALJ improperly disregarded.  Id.

To the extent Plaintiff is arguing that the ALJ overlooked the diagnoses by her treating physicians of a seizure condition, headaches, and right eye blindness, Plaintiff's argument is unavailing.  See Pl.'s Mot. at 2, 5–6; Pl.'s Reply at 3.  The ALJ consulted the medical records from Plaintiff's treating physicians, including Drs. Armstrong, Sierra and Ellis, which contain diagnoses of generalized epilepsy, tension headaches and right eye blindness, and made findings which closely resemble the above diagnoses by finding that Plaintiff's medically determinable impairments included "seizure disorder, controlled; tension headaches; and right eye blindness."  Id. at 15.

Further, to the extent Plaintiff is arguing that the ALJ disregarded Plaintiff's treating physicians' decision to place her on a restricted work schedule, such argument also fails.  See Pl.'s Mot. at 6.  The ALJ reviewed Plaintiff's medical records and specifically acknowledged that "[a]lthough [Plaintiff's] treating providers placed her on a modified work schedule of 4 hours of work per day in May and June 2011, there is no evidence that these restrictions were permanent."  AR at 17; see also id. at 16.

The Court has reviewed Plaintiff's medical records and agrees with the ALJ's determination.  Dr. Ellis placed Plaintiff "on modified activity at work and at home" from May 10

18

through May 13, 2011, and specified that Plaintiff was restricted to working four hours per day. Id. at 247. Dr. Sierra placed Plaintiff "on modified activity" from June 6 until June 10, 2011, and from June 21 through June 30, 2011, and noted that Plaintiff was to work "[h]alf day only," "4 hours daily." Id. at 245–46. There are no subsequent records from any of Plaintiff's treating physicians or other medical providers opining that Plaintiff needed to be on a restricted work schedule. See AR. As such, the Court finds that the ALJ properly acknowledged the restriction, found that it expired after June 2011, and concluded that there was no evidence in the record indicating that the restriction was permanent. See id. at 17.

The ALJ also properly determined that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled." See id. Although Plaintiff's treating neurologist, Dr. Armstrong, opined that Plaintiff would "require life-long anticonvulsant treatment for post-traumatic epilepsy," as discussed in detail below, Dr. Armstrong also stated that Plaintiff's seizure condition was well controlled by medication and that Plaintiff had been seizure-free since 2006, and cited numerous diagnostic tests substantiating his conclusion. Id. at 281; see also id. at 253, 346, 352–53, 377, 385, 413–14, 501. The key inquiry is "not whether plaintiff would require lifelong treatment for [his] impairments. The question is whether, despite having an impairment that requires lifelong care, such impairments produce disabling symptoms." Schwarz v. Comm'r of Soc. Sec. Admin., 2010 WL 2292225, at *8 (E.D. Cal. Jun. 4, 2010). Plaintiff has not identified (and the Court has not located) any evidence in the record indicating a specific restriction on Plaintiff's ability to work caused by her seizure condition. Likewise, there is no evidence in the record that any physician, including Plaintiff's treating physicians, has concluded that Plaintiff's other conditions are debilitating, such that a return to work would be impossible regardless of the treatment, or that

19

Plaintiff had limitations that were not incorporated into the ALJ's decision. <u>See</u> AR. Rather, the ALJ agreed with the treating physicians' diagnoses and then found that, despite the existing conditions, Plaintiff was able to perform specific types of work. <u>See</u> AR at 16–19.

In light of the above, the Court concludes that the ALJ properly considered Plaintiff's treating physicians' diagnoses of a seizure condition, headaches, and right eye blindness and their placement of Plaintiff on a restricted work schedule in May and June of 2011, and properly determined that Plaintiff was not disabled. The Court therefore **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on this issue be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

## II. <u>Plaintiff's Credibility</u>

Plaintiff argues that the ALJ erred in finding her less than fully credible. <u>See</u> Pl.'s Mot. at 4–6. Defendant maintains that the ALJ properly found that Plaintiff was less than fully credible and that substantial evidence supports such a finding. Def.'s Mot. at 4–7.

The Ninth Circuit has established a two-part test for evaluating a claimant's subjective symptoms. <u>See</u> <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." <u>Id.</u> (citation and internal quotation marks omitted). The claimant, however, need not prove that the impairment reasonably could be expected to produce the alleged degree of pain or other symptoms; the claimant need only prove that the impairment reasonably could be expected to produce some degree of pain or other symptom. <u>Id.</u> If the claimant satisfies the first element and there is no evidence of malingering, then the ALJ "can [only] reject the claimant's testimony about the severity of her symptoms . . . by offering specific, clear and

convincing reasons for doing so." Id. (citation and internal quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722 (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)). The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing the claimant's testimony, "an ALJ may consider . . . reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Orn, 495 F.3d at 636 (internal quotation marks and citation omitted). An ALJ also may consider the claimant's work record and testimony from doctors and third parties regarding the "nature, severity, and effect of the symptoms" of which the claimant complains. Thomas, 278 F.3d at 958–59; see also 20 C.F.R. § 404.1529(c). If the ALJ's finding is supported by substantial evidence, the court may not second-guess his or her decision. See Thomas, 278 F.3d at 959; Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1163 (9th Cir. 2008) (where the ALJ's credibility assessment is supported by substantial evidence, it will not be disturbed even where some of the reasons for discrediting a claimant's testimony were improper).

Neither party contests the ALJ's determination that Plaintiff has the following impairments: "[s]eizure disorder, controlled; tension headaches; and right eye blindness." AR at 15; see also Pl.'s Mot.; Pl.'s Reply; Def.'s Mot. Because the ALJ concluded that Plaintiff's "medically determinable impartments could reasonably be expected to cause the alleged symptoms," a finding which is not contested by either party, the first prong of the ALJ's inquiry

regarding Plaintiff's subjective symptoms is satisfied.  <u>See</u> AR at 16; <u>see also</u> <u>Lingerfelter</u>, 504 F.3d at 1036; Pl.'s Mot.; Pl.'s Reply; Def.'s Mot.  Further, neither party alleges that the ALJ found that Plaintiff was malingering.  <u>See</u> Pl.'s Mot.; Pl.'s Reply; Def.'s Mot.  As a result, the Court must determine whether the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective claims regarding her symptoms.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1036.

The ALJ provided several reasons for finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible," which are summarized below:

- the objective medical evidence did not support Plaintiff's allegations of a disabling physical impairment or combination of impairments and related symptoms;

- Plaintiff's allegations of debilitation were inconsistent with her daily activities;

- Plaintiff's work activity after the alleged onset date suggested that, at times, her daily activities were somewhat greater than reported;

- the prescribed medications were relatively effective in controlling Plaintiff's symptoms;

- Plaintiff's treatment was routine and/or conservative in nature; and

- the record does not contain any opinions from treating or examining physicians indicating that Plaintiff is disabled or has limitations greater than those determined by the ALJ.

AR at 16–17.  Plaintiff appears to challenge only two of the reasons provided by the ALJ: (1) the prescribed medications have been relatively effective in controlling Plaintiff's symptoms and (2) the record does not contain any opinions from treating or examining physicians indicating that Plaintiff is disabled.  <u>See</u> Pl.'s Mot. at 4–6; Pl.'s Reply at 2–4.  The Court will consider Plaintiff's challenges, as well as the other reasons provided by the ALJ.

**A. Plaintiff's Conditions are Effectively Controlled by Medication**

The ALJ found that Plaintiff's allegations were not fully credible, in part, because Plaintiff achieved some relief with medication. AR at 16–17. Plaintiff challenges such finding and argues that she suffered "sever[e]" injuries in the past, has a limited field of vision, and will require a life-long anticonvulsant treatment. Pl.'s Mot. at 5. Plaintiff further alleges that just because conditions are "attended by medication," does not mean that they do not occur and are not debilitating when they occur. Id. at 6.

Numerous notes from Plaintiff's treating neurologist, Dr. Armstrong, indicate that although Plaintiff developed a seizure disorder in 2005 and will "require life-long anticonvulsant treatment for post-traumatic epilepsy" [AR at 281], Plaintiff's condition is effectively controlled by Phenytoin/Dilantin.[5] See id. at 413–14 (noting in February 2006 that Plaintiff had "no recurrent seizures on Dilantin"), 385 (noting in November 2008 that Plaintiff was "seizure-free on current treatment regimen"), 377 (noting in April 2009 that Plaintiff was taking Phenytoin to manage seizures, tolerated Phenytoin well, and did not have interval seizures), 352–53 (noting in January 2010 that Plaintiff was "on [P]henytoin," tolerated Phenytoin well, did not have interval seizures, was "doing well," and should "[c]ontinue present management"), 346 (noting in October 2010 that Plaintiff had "no interval seizures" and was tolerating Phenytoin well), 253,

---

[5] "Phenytoin is used to control seizures (convulsions) in the treatment of epilepsy. . . . This medicine is an anticonvulsant that works in the brain tissue to stop seizures." http://www.mayoclinic.org/drugs-supplements/phenytoin-oral-route/description/drg-20072875 (last visited April 21, 2017) (also noting that it the medication is marketed under the brand name "Dilantin."). "Phenytoin . . . must be present at a concentration of between 10 and 20 micrograms per milliliter of blood (mcg/mL) in order to be effective." Peters v. Colvin, 2015 WL 349421, at *6 (C.D. Cal. Jan. 23, 2015) (citation omitted).

501 (noting in July 2011 that Plaintiff tolerated Phenytoin well and did not have interval seizures). Furthermore, laboratory studies confirm that Plaintiff's Dilantin/Phenytoin level was within the therapeutic range and that Plaintiff was compliant with treatment. See id. at 267 (containing Dr. Sierra's September 2011 notes that Plaintiff was "compliant with meds"), 293, 296, 302, 311, 315, 352, 377 (containing Plaintiff's laboratory studies and progress notes from Drs. Armstrong and Sierra listing Plaintiff's Dilantin level on various dates and stating that it was within the therapeutic range); see also id. at 291, 293, 296 (containing handwritten notes from medical providers at the Wilmington Community Clinic, which state that in July and December of 2012, and March 2013, Plaintiff's Dilantin/Phenytoin level was within the therapeutic range). Additionally, Plaintiff testified during her administrative hearing that she had not had any seizures since 2006. See id. at 31. Accordingly, the Court concludes that there was ample evidence supporting the ALJ's conclusion that Plaintiff's seizures are effectively controlled by medication.

The progress notes from Plaintiff's treating physicians also establish that her headaches responded favorably to medications. See id. at 413–14 (Dr. Armstrong's February 2006 note that "[h]eadaches seem to be improving and respond when severe to Tylenol or [I]buprofen"); 406–07 (Dr. Armstrong's October 2007 note that Plaintiff's headaches were "much less frequent" and that she "rarely t[ook] meds for them"), 385 (Dr. Armstrong's November 2008 progress note that "Plaintiff's [h]eadaches [we]re better"), 405–06 (Dr. Sierra's January 2008 note that Plaintiff took Vicodin and Tylenol for her headaches, "which help[ed]"), 505 (Dr. Sierra's May 2011 note that Plaintiff took Imitrex and Valium with "some relief"), 507 (Dr. Ellis' May 2011 notes that Plaintiff complained of "mild to moderate headaches" since her April 1, 2011 car accident, and that "[F]lexeril helped"). Further, other medical providers at the Wilmington

15cv1055-W (BLM)

Community Clinic, who examined Plaintiff after the onset date, also noted that her headaches responded to medications.  See id. at 297 (June 2012 notes stating that Plaintiff had headaches twice a week" and that "Ibuprofen 800 mg helps."), 290 (June 2013 notes stating that "once in a while [headaches] but [decreased] from Ibuprofen 800 mg"; also stating that Plaintiff "takes Ibuprofen 800 mg for [headaches]—it helps").

Further, Plaintiff's records contain notes from her treating physicians stating that they would refer Plaintiff to a headache management program if her headaches were not improving, but do not contain any records indicating that Plaintiff was referred to such program, thereby supporting the conclusion that Plaintiff's headaches were responding to medications.  See id. at 413–14 (Dr. Armstrong's February 2006 note stating that he might refer Plaintiff to the headache management program if her "headaches [we]re resistant"), 505 (Dr. Sierra's May 2011 note that she would "consider referral if [Plaintiff showed] no improvement" with her headaches).

In light of the above, the Court concludes that the ALJ's finding that Plaintiff's "medications have been relatively affective in controlling [Plaintiff's] symptoms" was supported by substantial evidence in the record and provides a clear and convincing reason for discounting her subjective claims.  See id. at 17; see also Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

**B. The Record Does not Contain any Medical Opinions from Treating or Examining Physicians Indicating that Plaintiff is Disabled or has Limitations Greater than those Articulated by the ALJ**

In her pleadings, Plaintiff does not identify any treating or examining physician who opined that she is disabled or that she had limitations greater than those articulated by the

ALJ.  See Pl.'s Mot.; Pl.'s Reply.  As discussed in detail above, the Court has reviewed the medical records from Plaintiff's treating physicians and found no evidence that a physician determined Plaintiff was disabled or that a physician imposed limitations greater than those utilized by the ALJ, other than during the two months following Plaintiff's April 1, 2011 car accident.  The Court also has reviewed medical records from other physicians and medical providers, and did not find any contrary opinions.  See AR.  The Court therefore concludes that substantial evidence in the record supported the ALJ's finding that no treating or examining physician opined that Plaintiff is disabled or had limitations greater than those determined by the ALJ.

### C. Conclusion

The Court finds that the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective claims regarding her symptoms.  See Lingenfelter, 504 F.3d at 1036.  As discussed above, the ALJ identified specific evidence in the record indicating that Plaintiff's conditions are controlled by medication, and properly found that there is no evidence in the record that any physician, including Plaintiffs treating physicians, concluded that Plaintiff's conditions are debilitating, such that a return to work would be impossible regardless of the treatment, or that limitations greater than those utilized by the ALJ were required. Furthermore, the ALJ provided additional reasons for discounting Plaintiff's credibility, which are not challenged by Plaintiff, including that Plaintiff's allegations of debilitation were inconsistent with her daily activities; Plaintiff's work activity after the alleged onset date suggested that, at times, her daily activities were somewhat greater than reported; and Plaintiff's treatment was routine and/or conservative in nature.  See AR at 16–17.  The Court has reviewed the record and finds substantial evidence supporting these reasons.  See e.g. id. at 32–35 (containing Plaintiff's testimony that she cleans her house, does chores, drives a car three times a week,

grocery shops, gardens for at least one hour every morning, walks three times a week for 20 minutes, and volunteers in her granddaughter's kindergarten classroom once a week); see AR (noting prescriptions of various medications for Plaintiff's headaches and seizure condition, but not containing any records indicating that Plaintiff was referred to a headache management program or a headache specialist).

Accordingly, there is ample evidence supporting the ALJ's conclusion that while Plaintiff likely experiences some intermittent pain and limitations, her allegations regarding the intensity, persistence, and limiting effects of her pain are not wholly credible. See AR at 16–17. The Court therefore **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on this issue be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

### III.   Plaintiff's Past Relevant Work

Plaintiff argues that the ALJ improperly categorized her prior work as a "volunteer coordinator" (DOT 187.167-022) instead of a "playground attendant," which she argues "best falls under O*NET code 68038 termed 'Child Care Workers,'" because the classification "reflects the appropriate amount of physical exertion and *presence outside*." Pl.'s Mot. at 8–9 (emphasis in original); Pl.'s Reply at 4–5. Plaintiff asserts that her position required her to spend at least three hours per day outside, and being outside is directly linked to her asserted limitations of sensitivity to light and tension headaches.[6] See Pl.'s Mot. at 9; Pl.'s Reply at 5. Plaintiff also

---

[6]   Plaintiff also claims that the VE *admitted* that Plaintiff's prior work "should have been [classified] as a 'child care attendant.'" Pl.'s Mot. at 9 (emphasis added) (citing AR at 51). The record Plaintiff cites in support contains the following questioning of the VE by Plaintiff's attorney:

> Q   For somebody who works as a playground attendant, is there a job title as that?

27

claims that any finding made by the ALJ that relies on the VE's testimony requiring "adjustment" is improper because it disregards the fact that Plaintiff's past relevant work required her to be outside for prolonged periods of time.  Pl.'s Reply at 5.  Defendant argues that Plaintiff failed in her burden at step four of the sequential evaluation.  Def.'s Mot. at 9–10.  Defendant contends that substantial evidence supported the ALJ's finding that Plaintiff was able to perform her past relevant work, or, in the alternative, to make an adjustment to perform other jobs existing in significant numbers in the national economy.  Id. at 10.

### 1.  Relevant Law

At step four of the sequential evaluation process, a claimant bears the burden of showing that he can no longer perform his past relevant work.  Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001).  "Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion."  Ocegueda v. Colvin, 630 Fed. App'x. 676, 677 (9th Cir. 2015) (quoting Pinto, 249 F.3d at 844).  In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain the following specific findings of fact: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a finding of fact that the individual's RFC would permit a return to her past job or occupation.  Ocegueda, 630 Fed. App'x. at 677 (citing SSR 82–62, 1982 WL 31386, at *4 (Jan. 1, 1982)).

---

A    A playground attendant?
Q    I mean she said she is watching the playground.
A    It would be a child care attendant.

AR at 51.  As such, Plaintiff's claim that the VE admitted a mis-classification is inaccurate.

The ALJ may deny benefits when the claimant can perform the claimant's past relevant work as "actually performed" or as "generally" performed. Pinto, 249 F.3d at 845; see also Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986) (stating that Plaintiff has the burden of establishing that he cannot "return to [her] former type of work and not just to [her] former job."). "While the claimant is the primary source for vocational documentation, . . . the ALJ may utilize a vocational expert ('VE') to assist in the step-four determination as to whether a claimant is able to perform her past relevant work." Ocegueda, 630 Fed. App'x. at 677 (citing 20 C.F.R. § 404.1560(b)(2) (providing that, at step four, a VE's testimony "concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy[,] . . . may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work").

### 2. Analysis

In this case, at his step-four analysis, the ALJ first determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff "retains the capacity to perform work activity that does not require peripheral vision or depth perception" and "must avoid a hazardous work environment and *prolonged periods outdoors*." AR at 15 (emphasis added). The VE categorized Plaintiff's past relevant work as a "volunteer coordinator," DOT 187.167-022. Id. at 48. At the administrative hearing, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience, who is blind in the right eye, has a seizure disorder, and should avoid hazardous environment and should "*avoid prolonged periods in the sunshine*" or "*prolonged outdoor periods*." Id. at 49 (emphasis added). The VE testified that such an individual could still perform

Plaintiff's past relevant work of a "volunteer coordinator." Id. The ALJ further questioned the VE as follows:

> Q     So as normally performed she could do that past work?
> A     Yes.
> Q     But as she performed it, it apparently put her outdoors for prolonged periods.
> A     Yes.
> Q     So with that particular duty, or at least the work as she performed it, she could not do that work?
> A     That's right.

Id. The VE further opined that Plaintiff could perform jobs as a "hospital cleaner" (DOT 323.687-010), "cleaner/housekeeper" (DOT 323.687-014), and a "dining room attendant" (DOT 311.677-018). Id. at 50–51.

The ALJ relied on the VE's testimony and reasoned as follows:

> The claimant has past relevant work as a volunteer coordinator (DOT 187.167-022, SVP-7), skilled and sedentary exertion but actually performed by the claimant at the sedentary to light exertion level. This job is past relevant work because the claimant performed it long enough to learn [it] and within 15 years from the date of adjudication, and her work earnings were at substantial gainful activity levels for the years she performed the job (Exhibits 1E, 4D).
>
> Hypothetically assuming the claimant's residual functional capacity as found above, the vocational expert opined that the claimant is able to perform the job[']s duties of her past relevant work as a volunteer coordinator, as generally performed in the national economy. The testimony of the vocational expert is consistent with the Dictionary of Occupational Titles, and the undersigned accepts it and so finds.

Id. at 18. The ALJ then found that Plaintiff was capable of performing her past relevant work of a "volunteer coordinator." Id.

Under the "job history" section of the disability report, Plaintiff stated that her job title was "community assistant," and that she worked for the San Diego City Schools from 1983 until June 30, 2011. See id. at 171. Plaintiff described her duties as "supervising students before

school and at lunch time, call[ing] parents for attendance and for problems in the classroom." Id. at 172. During the administrative hearing, Plaintiff testified that prior to her alleged onset of disability, she had worked as an "assistant, . . . a parent volunteer coordinator" for the San Diego Unified School District. Id. at 28–30, 38. Plaintiff stated that her duties included providing "translation [and conducting] conferences with parents," and that she spent approximately three hours per day outside, 40 minutes to one hour during "morning duty," two hours during "lunch duty," and about 30 minutes at dismissal. Id. at 28–30, 38–39. As such, Plaintiff's job, as actually performed, required presence outside.

"The best source for how a job is generally performed is usually the Dictionary of Occupational Titles." Pinto, 249 F.3d at 845. DOT 187.167-022 describes the "volunteer coordinator" position as:

> Coordinates student and community volunteer services program in organizations engaged in public, social, and welfare activities: Consults administrators and staff to determine organization needs for various volunteer services and plans for volunteer recruitment. Interviews, screens, and refers applicants to appropriate units. Orients and trains volunteers prior to assignment in specific units. Arranges for on-the-job and other required training and supervision and evaluation of volunteers. Resolves personnel problems. Serves as liaison between administration, staff, and volunteers. Prepares and maintains procedural and training manuals. Speaks to community groups, explaining organization activities and role of volunteer program. Publishes agency newsletter, and prepares news items for other news media. Maintains personnel records. Prepares statistical reports on extent, nature, and value of volunteer service. GOE: 11.07.01 STRENGTH: S GED: R5 M3 L5 SVP: 7 DLU: 77.

The above description does not provide any detail on the amount of time a person performing the "volunteer coordinator" job would have to spend outside. However, "ALJs may use either the 'actually performed test' or the 'generally performed test' when evaluating a claimant's ability to perform past work." Stacy v. Colvin, 825 F.3d 563, 569 (9th Cir. 2016) (citing SSR 82-61, 1982 WL 31387 (Jan. 1, 1982)). The "generally performed test" is applied as follows:

31

> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

Id.; see also Pinto, 249 F.3d at 845 ("We have never required explicit findings at step four regarding a claimant's past relevant work both as generally performed *and* as actually performed. The vocational expert merely has to find that a claimant can or cannot continue his or her past relevant work as defined by the regulations . . . ."); Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986) ("The claimant has the burden of proving an inability to return to his former *type* of work and not just to his former job."). Here, substantial evidence supported the ALJ's finding at step four that Plaintiff's prior work was properly classified as "volunteer coordinator" and that she could perform that job as *generally performed*. See Stacy, 825 F.3d at 570–71 (holding that the ALJ's step four findings were supported by substantial evidence, where plaintiff could "perform his past work as it is generally performed in the national economy," but could not perform his past work as actually performed); see also Parker v. Astrue, 384 Fed. App'x. 596, 598 (9th Cir. 2010) (holding that substantial evidence supported the ALJ's findings at step four where the ALJ concluded that plaintiff could perform her past relevant work "as it is generally performed in the national economy, not as [plaintiff] may have actually performed it in her particular position.").

Even if the ALJ erred in finding at step four that Plaintiff was capable of performing her past relevant work as a "volunteer coordinator," the error is harmless[7] and does not require remand as the ALJ proceeded to step five and made alternative findings.  See AR at 18–19.  At step five of the disability analysis, the burden shifts to the Commissioner to show the existence of other work in the national economy that a claimant can perform.  See Pinto, 249 F.3d at 844 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)).  To meet this burden, the Commissioner "must 'identify specific jobs existing in substantial numbers in the national economy that [the claimant] can perform despite [her] identified limitations.'"  Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (quoting Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)).  In making this determination, the ALJ relies on the DOT, which is the Social Security Administration's "primary source of reliable job information" regarding jobs that exist in the national economy.  Zavalin, 778 F.3d at 845–46 (citing Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990); 20 C.F.R. §§ 416.969, 416.966(d)(1)).  In addition to the DOT, the ALJ relies on the testimony of vocational experts with respect to specific occupations that a claimant can perform in light of his or her RFC.  Zavalin, 778 F.3d at 846 (citing 20 C.F.R. § 416.966(e); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009)).  The ALJ then determines "whether, given the claimant's [RFC], age, education, and work experience, [the claimant] actually can find some

---

[7]  Harmless error occurs if the error is "inconsequential to the ultimate nondisability determination."  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006); see also Stout v. Comm'r of Soc. Sec., 454 F.3d 1050, 1055–56 (9th Cir. 2006).  Errors that do not affect the ultimate result are harmless.  See Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007); see also Batson, 359 F.3d at 1197 (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion).

work in the national economy." Zavalin, 778 F.3d at 846 (citing Valentine, 574 F.3d at 689; 20 C.F.R. § 416.920(g)).

In this case, the ALJ considered at step five whether there were other jobs in the national economy that Plaintiff could perform, and found that Plaintiff could perform the jobs of a "dining room attendant" (DOT 311.677-018[8]) and a "hospital cleaner" (DOT 323.687-010[9]).  AR at 19. Plaintiff does not challenge the ALJ's conclusion at step five, and the record supports the ALJ's step five conclusion.  The DOT's descriptions of the "dining room attendant" and "hospital

---

[8]   DOT 311.677-018 describes the position as follows:

Performs any combination of following duties to facilitate food service: Carries dirty dishes from dining room to kitchen.  Wipes table tops and chairs, using damp cloth.  Replaces soiled table linens and sets tables with silverware and glassware. Replenishes supply of clean linens, silverware, glassware, and dishes in dining room.  Supplies service bar with food, such as soups, salads, and desserts.  Serves ice water and butter to patrons.  Cleans and polishes glass shelves and doors of service bars and equipment, such as coffee urns and cream and milk dispensers. Makes coffee and fills fruit juice dispensers. May sweep and mop floors. May transfer food and dishes between floors of establishment, using dumbwaiter, and be designated Dumbwaiter Operator (hotel & rest.).  May run errands and deliver food orders to offices and be designated Runner (hotel & rest.).  May be designated according to type of activity or area of work as Clean-Up Helper, Banquet (hotel & rest.); Counter Dish Carrier (hotel & rest.); Dish Carrier (hotel & rest.); Glass Washer And Carrier (hotel & rest.); Room Service Assistant (hotel & rest.); Steamtable Worker (hotel & rest.); Table Setter (hotel & rest.); Water Server (hotel & rest.).  GOE: 09.05.02 STRENGTH: M GED: R2 M1 L1 SVP: 2 DLU: 80

[9]  DOT 311.677-018 describes the position as:

Cleans hospital patient rooms, baths, laboratories, offices, halls, and other areas: Washes beds and mattresses, and remakes beds after dismissal of patients. Keeps utility and storage rooms in clean and orderly condition.  Distributes laundered articles and linens.  Replaces soiled drapes and cubicle curtains.  Performs other duties as described under CLEANER (any industry) I Master Title.  May disinfect and sterilize equipment and supplies, using germicides and sterilizing equipment. GOE: 05.12.18 STRENGTH: M GED: R2 M1 L2 SVP: 2 DLU: 87.

cleaner" jobs indicate that they require medium exertion, do not involve "hazardous work environment," and neither require "peripheral vision or depth perception" nor presence outdoors. See DOT 311.677-018, DOT 323.687-010. Given the ALJ's RFC determination, the ALJ properly determined that Plaintiff could perform the above jobs. See AR at 15, 19. Further, the ALJ posed to a VE a hypothetical incorporating Plaintiff's RFC, and properly relied on VE's testimony that Plaintiff's age, education, experience, and RFC qualified her to perform the requirements of a "dining room attendant" job, and that 390,000 such positions existed nationally and 5,000 jobs regionally; and a "hospital cleaner" job, with 800,000 jobs nationally and 9,000 jobs regionally. See id. at 18–19, 49–51. As such, the ALJ's conclusion at step five that Plaintiff's limitations still allowed her to work as a "dining room attendant" and a "hospital cleaner," and that Plaintiff was thus not disabled, was supported by substantial evidence.

Because the ALJ properly found at step five that Plaintiff could perform other alternative work, any error regarding the ALJ's review of Plaintiff's ability to perform the specific job of a "volunteer coordinator" at step four is "inconsequential" to the ALJ's ultimate determination that Plaintiff is not entitled to the past benefits she seeks, and any alleged error the ALJ made in concluding that Plaintiff could work as a "volunteer coordinator" was harmless. See Parra, 481 F.3d at 747. Accordingly, the Court finds the ALJ properly determined that Plaintiff can perform her past relevant work and, alternatively, that she can perform other jobs available in the national economy. The Court therefore **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on this issue be **DENIED** and that Defendant's cross-motion be **GRANTED**.

///

///

///

15cv1055-W (BLM)

## **CONCLUSION**

For the reasons set forth above, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED** and that the decision of the ALJ be **AFFIRMED**.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties no later than **May 30, 2017**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **June 13, 2017**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated: 5/15/2017

_Barbara L. Major_
Hon. Barbara L. Major
United States Magistrate Judge

15cv1055-W (BLM)